UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

APR 2 3 2018

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) **UNDER SEAL** |
| | ) |
| OMED HUSSEINKHEL, | ) Criminal Case No. 1:18-MJ-197 |
| a/k/a "Gambit," | ) |
| | ) |
| WASSIM BANIHASHEMI, | ) |
| a/k/a "Mo," | ) |
| | ) |
| and | ) |
| | ) |
| TIMOTHY DARREN PROCTOR, | ) |
| | ) |
| | ) |
| Defendants. | ) |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, Andrew B. Lenhart, Special Agent with the Federal Bureau of Investigation ("FBI"),
Washington Field Division, being duly sworn, depose and state the following:

### I.     INTRODUCTION

1.     This affidavit is submitted in support of a criminal complaint and arrest warrant
charging OMED HUSSEINKHEL, also known as "GAMBIT," WASSIM BANIHASHEMI, also
known as "MO", and TIMOTHY DARREN PROCTOR, with knowingly, intentionally, and
unlawfully combining, conspiring, confederating, and agreeing with each other, as well as others,
known or unknown, to distribute a mixture and substance containing a detectable amount of
oxycodone, a Schedule II controlled substance, in violation of Title 21, United States Code,
Sections 841(a)(1) and 846.

1

2. This affidavit is for the limited purpose of obtaining a criminal complaint and arrest warrant. It is not intended to include each and every fact and matter observed by me or known to the government.

## II. AFFIANT'S EXPERIENCE

3. I have been a Special Agent with the FBI since 2003. I am presently assigned to the FBI's Washington Field Division, where I investigate white-collar crimes and drug offenses. As a Special Agent of the FBI, I am empowered by law to conduct investigations, make arrests, and execute and serve search and arrest warrants for offenses enumerated in Titles 18 and 21 of the United States Criminal Code, including offenses involving conspiracies to obtain and distribute pills containing oxycodone and other drugs, including heroin, cocaine, and marijuana in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

4. Title 21, Code of Federal Regulations, Section 1308.12(b)(1)(xiii) specifies that oxycodone is a Schedule II controlled substance. According to the Drug Enforcement Agency's scheduling parameters and under Title 21 United States Code, Section 812, Schedule II controlled substances have currently acceptable uses in treatment for medical issues in the United States, but they are subject to comprehensive restrictions and regulations because of the significant potential for abuse, which may lead to serious psychological and/or physical dependence. Indeed, through my training and experience, I have learned that oxycodone's effect on the abuser's brain and body is similar to heroin, a Schedule I drug. Thus, oxycodone addiction has fueled a heroin epidemic.

5. Through my training and experience, I am familiar with oxycodone, which is the main ingredient in the drugs distributed by their trade names: Roxicodone, Percocet, and OxyContin. Oxycodone has become popular among pharmaceutical drug abusers. Addicts often crush oxycodone and snort the powder. Oxycodone pills typically have a time-release mechanism,

2

which delays the rate at which the oxycodone is absorbed into the body. Addicts defeat the time-release mechanism of oxycodone pills by eliminating the outer coating of the pills, thereby allowing the oxycodone to be absorbed into the body faster than intended by the manufacturer. In addition, drug addicts frequently exchange prescription narcotics, such as oxycodone, for other illicit narcotics, such as heroin, cocaine, or cocaine base. Pills containing oxycodone commonly sell on the street for approximately $1 per milligram of oxycodone. These pills are manufactured in 5 mg, 10 mg, 15 mg, 30 mg, 40 mg, 60 mg, and 80 mg strengths. Most recently, oxycodone 30 mg pills, which are blue in color, have become the choice of addicts and their respective dealers because they are most easily abused due to their formulation. Oxycodone 30 mg pills are commonly referred to by street dealers as "thirties," "blues," "beans," "blue dragons," and "blue dogs." They are also referred to by names that refer to the stamping on the pills provided by their respective manufacturers including: "Ms," "Vs," "As," "2s," "4s," and "K9s."

6.      Title 21, United States Code, Section 841(a)(1) prohibits any person from knowingly or intentionally manufacturing, distributing, or dispensing, or possessing with intent to manufacture, distribute, or dispense, a controlled substance.

7.      Title 21, United States Code, Section 846 prohibits any person from attempting or conspiring to commit any offense in the same subchapter, including those described in Section 841(a)(1).

## III.     PROBABLE CAUSE

8.      The facts and information contained in this affidavit are based upon my personal knowledge of the investigation and observations of other officers and agents involved in the investigation. All other observations were related to me or to law enforcement by the persons who made such observations. This is a joint investigation conducted by other law enforcement

3

agencies, including members of the Fairfax County Police Department, the Loudoun County Sheriff's Department, the Prince William County Police Department, the Alexandria City Police Department, the Arlington City Police Department, and the Montgomery County Police Department.

9.     The evidence in support of the complaint includes statements provided to law enforcement agencies by the defendants, co-conspirators, cooperators, video surveillance; the Virginia Prescription Monitoring Program ("VPMP"); incident reports from law enforcement agencies; and physical surveillance by law enforcement. During this investigation, the FBI and local law enforcement have used various investigative techniques, including—but not limited to—confidential informants, surveillance, recorded jail conversations, toll records, pen registers, Global Positioning System ("GPS") phone tracking, forensic extractions of cell phones, search warrants, controlled purchases of contraband, police reports, and the use of an undercover Agent.

10.     I submit there is probable cause that HUSSEINKHEL, BANIHASHEMI, and PROCTOR, along with others, unlawfully conspired with one another to distribute and distributed controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 846, in the Eastern District of Virginia.

## Overview of the Conspiracies

11.     Beginning in mid-2016 through in or about March 2018, HUSSEINKHEL, BANIHASHEMI, and PROCTOR knowingly, intentionally, and unlawfully combined, conspired, confederated, and agreed with one another and with others to distribute oxycodone to individuals residing in the Eastern District of Virginia. The conspiracy appears to include at least ten individuals.

4

12.     Additionally, HUSSEINKHEL and PROCTOR engaged in the sale of a firearm. The investigation has revealed that PROCTOR also used or carried a firearm during and in relation to a drug trafficking crime in violation of Title 18, United States Code, Section 924(c).    Both HUSSEINKHEL and PROCTOR are convicted felons prohibited from possessing firearms under Section 922(g).

13.     In 2014, HUSSEINKHEL was identified to your affiant by a person hereinafter referred to as Unindicted Co-Conspirator 28 (UCC-28) as a drug co-conspirator of AHMAD SAYED HASHIMI, a subject of FBI investigation who was eventually convicted at trial of drug conspiracy, interstate domestic violence, and kidnapping charges in the District Court for the Eastern District of Virginia in September 2016. As a result of further investigation, HUSSEINKHEL was identified as a co-conspirator who facilitated drug transactions of cocaine, oxycodone, marijuana, MDMA, and other controlled substances between third parties; sold oxycodone pills himself; transported and sold cocaine himself; sold a firearm; recruited members of the conspiracy to purchase stolen identities; used the stolen identities to obtain iPhones fraudulently for sale on the black market; and benefited from the financial and drug proceeds of the aforementioned conspiracies.

14.     WASSIM BANIHASHEMI was identified as a co-conspirator who sold oxycodone pills, cocaine, marijuana, and cannabis oils.

15.     PROCTOR was identified as a co-conspirator who sold oxycodone pills and other controlled substances; purchased marijuana and MDMA for resale; and sold a firearm to HUSSEINKHEL. PROCTOR is currently incarcerated in Charles County, Maryland on attempted murder charges.

5

16.     Members of the conspiracy also conspired to illegal open fraudulent AT&T service accounts using stolen identities and fraudulent credit cards to obtain iPhones which were then sold on the black market. Among other crimes, this is a violation of Title 18 United States Code 1028(A), Aggravated Identity Theft, and Title 18 United States Code 1343, Wire Fraud, and Title 18 United States Code 1349, Conspiracy to Commit Wire Fraud.

## Drug Trafficking Conspiracy

17.     Information in this affidavit was obtained with the assistance of confidential source 1 (hereinafter referred to as "CS-1"), who has been interviewed by law enforcement over sixty times between June 2016 and April 2018. Law enforcement used several means to corroborate the information provided by CS-1, including confidential informants, physical surveillance, audio/video surveillance, recordings, and documents. CS-1 has no pending charges in the Eastern District of Virginia. CS-1 has received monetary payment for providing information in connection with this case and other cases in the past. In sum and substance, the information provided by CS-1 is related below.

18.     Between July 2016 and September 2016, CS-1 conducted four controlled purchases directly from HUSSEINKHEL at the direction of the FBI. Three of these operations resulted in the purchase oxycodone pills among other contraband from HUSSEINKHEL. HUSSEINKHEL also facilitated CS-1's introduction to BANIHASHEMI for the purpose of purchasing drugs from BANIHASHEMI. As a direct result of the introduction, CS-1 participated in at least five additional controlled purchases of narcotics. These controlled purchases from BANIHASHEMI were used to obtain oxycodone pills, cocaine, and cannabis oil as further evidence of the drug conspiracy.

19.     In approximately May 2016, CS-1 first met HUSSEINKHEL in Springfield, Virginia. HUSSEINKHEL was employed at an AT&T Store in Springfield, Virginia. Later in May 2016, HUSSEINKHEL asked CS-1 to provide him with names, identifiers, and Social Security Numbers of unwitting persons for HUSSEINKHEL to use in a conspiracy to register fraudulent AT&T accounts for the purpose of illegally acquiring iPads, smart phones, and other technological devices for sale on the black market and overseas. HUSSEINKHEL also asked CS-1 to drive him from Springfield, Virginia to Richmond, Virginia to pick up 0.5 kilograms of cocaine.

### Drug Transactions with HUSSEINKHEL and PROCTOR

20.     In June 2016, CS-1 witnessed HUSSEINKEL provide an individual identified herein as Unindicted Co-Conspirator 7 (UCC-7) with approximately one ounce of MDMA powder. CS-1 witnessed HUSSEINKHEL sell drugs for profit to various individuals approximately 12 separate times between May 2016 and July 2016 within the Eastern District of Virginia. These drugs included ketamine, MDMA, marijuana, and cocaine. Many of these transactions took place in and around the 1320 Club in Springfield, Virginia.

21.     On July 12, 2016, at the direction of the FBI, CS-1 met with HUSSEINKHEL in Alexandria, Virginia to purchase the illicit drug cocaine. The meeting was surreptitiously video and audio recorded by the FBI, as well as monitored by live transmitter. At approximately 10:02 a.m., while CS-1 and HUSSEINKHEL waited together in CS-1's vehicle parked in the driveway, a man—later identified by CS-1 as the individual identified herein as Unindicted Co-Conspirator 4 (hereinafter UCC-4)—arrived in a white Acura SUV. UCC-4 parked the Acura SUV adjacent to the driveway. In conjunction with UCC-4's arrival, HUSSEINKHEL exited CS-1's vehicle, approached UCC-4's vehicle, and met with UCC-4. At approximately 10:07 a.m.,

HUSSEINKHEL re-entered CS-1's vehicle and stated, as confirmed through the audio recording, "A little situation developed. He gave me nine and gave the cash back. He said that's all he had. It's the [unintelligible], so he only charged me five for the nine grams. That's your 250 back. Alright?" A package can be seen on the video being exchanged from HUSSEINKHEL to CS-1. HUSSEINKEL continued, "Tell him I said I'm sorry. He said if you want you can get the rest tonight. Remember the other guy from P.A. is coming back." Following the controlled purchase, the FBI recovered from CS-1 a small bag containing approximately 9 grams of white powder that field tested positive for cocaine. This item was sealed by your affiant and submitted as evidence at the FBI office in Manassas, Virginia.

22.     On August 24, 2016, at the direction of the FBI, CS-1 met with HUSSEINKHEL at the AT&T Store located at 5890 Kingstowne Center, Alexandria, Virginia. The meeting was prearranged for CS-1 to obtain the illicit drug cocaine and the prescription drug oxycodone from HUSSEINKHEL. At approximately 10:48 a.m., FBI Agents in surveillance positions at the location observed HUSSEINKHEL leave the store and approach a black Honda sedan in the parking lot in front of the store. A black male in a white t-shirt, later identified as PROCTOR, exited the vehicle and began conversing with HUSSEINKHEL. The two men walked together into the AT&T store. PROCTOR exited the store after a few moments, returned to his vehicle and exited the parking lot in the Honda sedan. At approximately 11:15 a.m., under additional FBI surveillance, CS-1 arrived in the parking lot adjacent to the AT&T store, exited his/her vehicle and entered the AT&T store where HUSSEINKHEL was at the time. The meeting was surreptitiously audio recorded by the FBI, as well as monitored by live transmitter. On the recording HUSSEINKHEL can be heard saying, "so it's 810 instead of nine." CS-1 later verified that he understood this statement was in reference to the price HUSSEINKEL wanted for the cocaine that

UCC-4 was bringing. An excerpt of the conversation inside the AT&T store that occurred at approximately 11:27 a.m. follows:[1]

| | |
|---|---|
| HUSSEINKHEL: | This mother fucker texted me sayin' the president and vice president of the company are visiting today. I didn't tell you that. |
| CS-1: | Nice |
| HUSSEINKHEL: | Didn't tell you that. |
| CS-1: | Yeah |
| HUSSEINKHEL: | You see how clean everything is shit? |
| CS-1: | Yeah. Imagine....Don't worry about us. We're just dealing some drugs. |
| HUSSEINKHEL: | Yeah. (laughs) We just..you know. |
| CS-1: | This shit ain't on audio right? The video? |
| HUSSEINKHEL: | No. I don't. Fuck no. |
| CS-1 | I know. |
| HUSSEINKHEL: | You can't prove shit. What are you going to prove? That was drugs?... Prove it! That money wasn't for me...Prove it. |

At approximately 12:10 p.m., CS-1 stepped outside the store and called your affiant. CS-1 stated he/she already had pills that were procured from PROCTOR and was waiting for HUSSEINKEL's cocaine contact to arrive with the cocaine. At approximately 12:55 p.m., a tan Chevrolet crossover vehicle arrived in the parking lot in front of the AT&T store and parked next to CS-1's vehicle.

---

[1] The use of ellipses in the following conversation indicates a pause and does not indicate statements that have been deleted.

The driver, identified by CS-1 and photographs taken by FBI surveillance as UCC-4, met briefly with HUSSEINKHEL adjacent to UCC-4's vehicle. HUSSEINKHEL then walked over to CS-1's vehicle and entered the passenger compartment. UCC-4 exited the parking lot in his vehicle. HUSSEINKHEL and CS-1 drove a few hundred feet to a nearby UNO's pizza where HUSSEINKHEL exited CS-1's vehicle. CS-1 then returned to a pre-determined rally point under FBI surveillance. CS-1 produced 80 white oval pills stamped "U 16" and one small round pink pill stamped "NP 12", which were delivered to HUSSEINKHEL by PROCTOR, and all of which were identified by your affiant as oxycodone 10 mg pills. CS-1 also obtained from HUSSEINKHEL a small bag containing approximately 0.5 ounces of white powder that field tested positive for cocaine, which was delivered to HUSSEINKHEL by UCC-4. These items were sealed by your affiant and submitted as evidence at the FBI office in Manassas, Virginia.

23.     On August 30, 2016, at the direction of the FBI, CS-1 met with HUSSEINKHEL at the AT&T Store located at 5890 Kingstowne Center, Alexandria, Virginia. The meeting was prearranged for CS-1 to obtain the illicit drug cocaine, the prescription drug oxycodone, and a handgun from HUSSEINKHEL. Also at the direction of the FBI, CS-1 had introduced the idea of purchasing a firearm. At approximately 11:30 a.m., FBI Agents in surveillance positions observed a thin black male with dreadlocks, later identified as PROCTOR, in a black Audi sedan in the parking lot in front of the store. He exited the sedan carrying a plastic bag containing what appeared to be a small box and entered the AT&T store. PROCTOR exited the store approximately six minutes later without the plastic bag and re-entered the black Audi sedan. At approximately 11:53 a.m., under additional FBI surveillance, CS-1 arrived in the parking lot adjacent to the AT&T store, exited his/her vehicle and entered the AT&T store. At 11:58 a.m., CS-1 texted your affiant a photograph of a .380 Colt semi-automatic hand gun engraved with "US Property." At

10

approximately 12:08 p.m., while CS-1 remained inside the AT&T store, HUSSEINKHEL exited the AT&T store, walked across the parking lot and met briefly with PROCTOR at the driver's side window of the Audi sedan. HUSSEINKHEL was observed transferring something small from his hand to the hand of PROCTOR, who remained in the sedan. HUSSEINKHEL then returned back inside the AT&T store. At approximately 12:15 p.m., an olive skinned male, later identified as UCC-4, arrived in the parking lot of the AT&T driving a tan Chevrolet crossover. At approximately 12:17 p.m., while CS-1 remained inside the AT&T store, HUSSEINKHEL exited the AT&T store, approached and briefly entered the passenger side of the tan Chevrolet. At approximately 12:18 p.m., HUSSEINKHEL exited the tan Chevrolet and re-entered the AT&T store as UCC-4 drove away in the tan Chevrolet. At approximately 12:23 p.m., CS-1 exited the AT&T store, re-entered his/her vehicle, and drove to a pre-determined rally point under FBI surveillance. CS-1 produced three categories of items to FBI agents: first, 5 white oval pills stamped "U 16", one small round pink pill, and a green pill stamped with an "M," all of which were identified as oxycodone pills and were purchased from HUSSEINKHEL, who in turn obtained them from PROCTOR. Second, CS-1 produced a small bag containing approximately 0.5 ounces of white powder that field tested positive for cocaine, which was purchased from HUSSEINKHEL who obtained it from UCC-4. All of these items were sealed by your affiant and submitted as evidence at the FBI office in Manassas, Virginia. Third, CS-1 produced a .380 Colt semi-automatic hand gun with serial number 135784 marked "US Property." The handgun was loaded with a single .38 round in the chamber. The handgun was rendered safe and entered into evidence at the FBI office in Manassas, Virginia.

## Introduction to BANIHASHEMI

24. In October 2016, HUSSEINKHEL told CS-1 that he had a new supplier of oxycodone pills. CS-1 witnessed HUSSEINKHEL take a phone call from a previously unidentified male, who told HUSSEINKHEL that he could sell large quantities of oxycodone to HUSSEINKHEL for resale. HUSSEINKHEL told CS-1 that his "new supplier" had 30 oxycodone 15 mg pills, 100 oxycodone 30 mg pills, and 100 oxycodone 40 mg pills to sell for a total of $10,000.

25. In approximately November 2016, BANIHASHEMI was introduced to CS-1 by HUSSEINKHEL, as a social acquaintance.

26. On December 14, 2016, another controlled purchase was conducted. HUSSEINKHEL arranged for CS-1 to purchase oxycodone 30 mg pills from a "contact" who was later revealed to CS-1 to be BANIHASHEMI. At approximately 12:28 p.m., under FBI surveillance, and after being provided with two recorders and a live transmitter, CS-1 arrived in the parking lot in front of a residence in Burke, Virginia and approached the door to the residence. BANIHASHEMI greeted CS-1, and they entered the residence together as FBI Agents monitored the live transmitter. Approximately fourteen minutes later, CS-1 and BANIHASHEMI re-appeared at the front door. CS-1 exited the residence and drove under FBI surveillance to a pre-determined rally point. At this location CS-1 provided your affiant a clear baggy containing 43 small round blue pills identified as oxycodone 30 mg pills. BANIHASHEMI sold CS-1 these in exchange for $1,600 in government funds. BANIHASHEMI also provided CS-1 a small clear baggy containing a "sample" of powder cocaine. BANIHASHEMI obtained the pills and cocaine from a flat safe in the basement of the residence. CS-1 observed that the safe contained what appeared to be a significant quantity of drugs including powder cocaine, molly powder (MDMA),

12

and a bag of at least 100 oxycodone 30 mg pills. The 43 oxycodone 30 mg pills and the clear baggy containing the powder cocaine sample were sealed by your affiant and submitted as evidence at the FBI office in Manassas, Virginia.

### HUSSEINKHEL's Drug Transactions on Behalf of UCC-14

27.     HUSSEINKEL has also sold controlled substances on behalf of Unindicted Co-Conspirator 14 (UCC-14). HUSSEINKHEL told CS-1 that he has known UCC-14 for approximately 20 years. HUSSEINKHEL also told CS-1 that UCC-14 had been a supplier of marijuana to HUSSEINKHEL for several years.

28.     On March 10, 2017, UCC-14 was arrested by Fairfax County Police for charges under Virginia law of marijuana distribution and identity theft. HUSSEINKHEL told CS-1 that UCC-14 contacted HUSSEINKHEL from the Fairfax County jail and told HUSSEINKHEL to sell marijuana and pills that UCC-14 had hidden in a residence and return proceeds to UCC-14's girlfriend. Your affiant obtained jail recordings of conversations between UCC-14 and HUSSEINKHEL, which contain a coded conversation that, based on your affiant's training and experience, corroborate the information relayed to your affiant by CS-1.

29.     At approximately 8:00 p.m. on March 13, 2017, a young Asian male arrived at a residence in Springfield, Virginia where HUSSEINKHEL was living with his parents. CS-1 witnessed the Asian male deliver two duffel bags containing approximately three pounds of vacuum sealed marijuana and a bag containing over 100 pills. Most of the pills were believed by CS-1 to be ecstasy (MDMA). HUSSEINKHEL told CS-1 the total value of the contraband was over $10,000. The duffel bags also contained a scale, empty plastic bags, and a sealing machine. HUSSEINKHEL told CS-1 that UCC-14 was renting a room from the Asian male, who is a drug conspirator of UCC-14's. The Asian male removed a 0.5 pound bag of marijuana from the duffel

13

bag and left the residence. Approximately four hours later, CS-1 witnessed PROCTOR arrive at the residence and purchase marijuana and ecstasy (MDMA) pills from HUSSEINKHEL for $2,500.

30. HUSSEINKHEL told CS-1 the following day that PROCTOR returned to the residence to dispute the weight of the drugs that HUSSEINKHEL sold him. PROCTOR brandished a pistol and demanded his money back. HUSSEINKHEL returned the $2,500 but PROCTOR kept some of the marijuana and did not return it all.

31. On approximately March 28, 2017, BANIHASHEMI told CS-1 that he purchased some of the drugs from HUSSEINKHEL that came from UCC-14.

### Introduction of UCE

32. On April 27, 2017, the FBI conducted another controlled purchase of oxycodone pills and cocaine by CS-1 from BANIHASHEMI in the parking lot adjacent to the Hard Times Café located at 6362 Springfield Plaza, Springfield, Virginia. BANIHASHEMI facilitated this transaction directly with CS-1. During conversations used to facilitate the transaction, CS-1 told BANIHASHEMI that the pills were intended for his "friend" from the Poconos in Pennsylvania. CS-1's "friend" was actually an undercover employee of the FBI, hereinafter referred to as UCE. CS-1 tried to arrange a meeting between BANIHASHEMI and the UCE at the Hard Times Café to conduct the transaction. At approximately 4:56 p.m., BANIHASHEMI arrived in the parking lot adjacent to the Hard Time Café driving a silver Lexus. BANIHASHEMI declined to meet UCE so CS-1 exited the Hard Times Café and entered the silver Lexus driven by BANIHASHEMI. The

meeting was recorded surreptitiously by CS-1 at the direction of the FBI. An excerpt of the conversation follows:[2]

| | |
|---|---|
| BANIHASHEMI: | I love hundreds. |
| CS-1: | [Unintelligible] Who doesn't? Tell me the person who doesn't and I tell you there's something wrong with that motherfucker. |
| BANIHASHEMI: | Definitely definitely definitely wrong with his ass. Yeah |
| CS-1: | Yeah I got my boy inside so… |
| BANIHASHEMI: | Oh alright. I'm going to eat right now. Right here. You picked it out right there? |
| CS-1: | I did. [Whistling] he um. |
| BANIHASHEMI: | Mmm Yooo. Your boy just in tonight, for a little bit? Or he's leaving today? |
| CS-1: | He's leaving today. He need to take care of some business and some phones. Take care of this with you. And um he. |
| BANIHASHEMI: | Alright. Alright. Alright. |
| CS-1: | This. this. |
| BANIHASHEMI: | Oh he's doing phones now too? |
| CS-1: | Yeah well this was something I had time… remember I told you this was something with the cards? |
| BANIHASHEMI: | Yeah. Yeah. |

---

[2] The use of ellipses in this conversation indicates a pause and does not indicate statements that have been deleted.

| | |
|---|---|
| CS-1: | He does the cards. He does the credit cards. |
| BANIHASHEMI: | Oh really? What do you mean he gets the credit cards? |
| CS-1: | He gets the credit cards He gets the credit cards made up. He's got a connect where he gets credit cards made up. |
| BANIHASHEMI: | Are you serious? |
| CS-1: | Yes. We just get the phone and we good. |
| BANIHASHEMI: | Really? |
| CS-1: | Yeah. |
| BANIHASHEMI: | Damn. How many phones did you get? |
| CS-1: | We just got 3 up today... but this is something we're gonna try to do continuously. |
| BANIHASHEMI: | Yeah. He [HUSSEINKHEL][3] is about to get fired anyway |
| CS-1: | I know he's crazy. |
| BANIHASHEMI: | Yeah he's about to get fired they're firing his ass. |
| CS-1: | Yeah. |
| BANIHASHEMI: | So he's just wallowing down now till they fire him? |
| CS-1: | I guess that's what he's doing. He's wallowing out so it's like... |
| BANIHASHEMI: | That's extra money and shit. Let me know if the credit card continues. Can you order shit online with it? |
| CS-1: | You wanna come in? |

---

[3] Based on your affiant's experience with this investigation, your affiant understands this to be a reference to HUSSEINKHEL, who BANIHASHEMI knew was engaged in using false credit cards and false identities to fraudulently obtain iPhones.

| | |
|---|---|
| BANIHASHEMI: | Huh? |
| CS-1: | We're right there in the front. |
| BANIHASHEMI: | Can you order something online with it? |
| CS-1: | I'm sure you could but he's gotta get it made up and you know. It cost a couple of bucks but it's not crazy. |
| BANIHASHEMI: | Yeah. |
| CS-1: | We just did this to see how things was gonna run and it went smooth just as expected. |
| BANIHASHEMI: | Wow... yo hit me up let me know... ask him I gotta go ask him, I got someone waiting for me but I'm gonna go eat right now. |
| CS-1: | I told him. He said tell ya to come in. He said you could come in. |
| BANIHASHEMI: | I didn't eat all day. |
| CS-1: | Yeah well neither did I that's why we just grabbed a burger just now. |
| BANIHASHEMI: | Oh shit. |
| CS-1: | Cuz I'm getting light headed. |
| BANIHASHEMI: | Nah I'm gonna go eat some kabob right after. |
| CS-1: | Alright. |
| BANIHASHEMI: | Hit me up. Let me... Ask him if I could use the credit card online. If if I can... let me get that motherfucker. (laughing) |

| CS-1: | Straight up. |
|---|---|
| BANIHASHEMI: | Let him know. |
| CS-1: | (laughing) you're crazy? |
| BANIHASHEMI: | I'll get him all the pills he wants if he.... |
| CS-1: | Huh? |
| BANIHASHEMI: | I'll get him all the pills he wants bro. Don't worry about it. |
| CS-1: | Alright. |

CS-1 obtained 25 small round blue pills identified as oxycodone 30 mg pills from BANIHASHEMI via the controlled purchase. These pills were sealed by your affiant and submitted as evidence at the FBI office in Manassas, Virginia.

### BANIHASHEMI's Arrest in Arlington County

33.    On May 30, 2017, HUSSEINKHEL contacted CS-1 to tell CS-1 that BANIHASHEMI and an individual identified herein as Unindicted Co-Conspirator 6 (UCC-6) were arrested by law enforcement in Arlington, Virginia. HUSSEINKHEL told CS-1 that the officers seized approximately $13,000 and marijuana from BANIHASHEMI's vehicle.

34.    On June 22, 2017, Detective Charles Brown of the city of the Arlington County Police Department provided your affiant with an incident report from a May 30, 2017 incident involving BANIHASHEMI and UCC-6. According to the report, BANIHASHEMI and UCC-6 were parked in a silver Lexus in Arlington, Virginia. At approximately 6:15 p.m. Detective Reese observed BANIHASHEMI roll what appeared to be a marijuana cigarette while he was sitting in the driver's seat. Detective Reese conducted a traffic stop of BANIHASHEMI's vehicle and determined that probable cause existed for a search of the vehicle, which he executed. BANIHASHEMI admitted to officers that he rolled the marijuana cigarette. A prescription pill

bottle for Xarelto 10mg (RX# 1132918, filled on February 8, 2017, and issued to BANIHASHEMI) was located in the vehicle but the pill bottle contained only marijuana. BANIHASHEMI also had $600 cash in his pocket. During the search of the vehicle, $12,000 cash was found in a FedEx shipping envelope in the glove box of the vehicle.[4]

35.     Also located in the vehicle was a set of brass knuckles concealed in the driver's side door pouch. BANIHASHEMI initially denied the brass knuckles were his but later admitted they belonged to him. BANIHASHEMI stated the Lexus he was driving belonged to his father and he rarely drove it. The marijuana, brass knuckles, $12,600 cash, and BANIHASHEMI's Samsung Galaxy S7, SM-G891A, bearing IMEI number 351714081503428 were seized as evidence.

36.     UCC-6 consented to a search of his body. During the search a glass meth pipe containing residue was located in his pocket.

37.     BANIHASHEMI was charged in Arlington County District Court with misdemeanor charges of possession of a concealed weapon and possession of marijuana. BANIHASHEMI plead guilty to both counts on July 18, 2017.

### Additional Drug Transactions with BANIHASHEMI

38.     On July 14, 2017, at the direction of the FBI, UCE was introduced to BANIHASHEMI by CS-1 for the purpose of conducting a controlled purchase of 50 oxycodone 30 mg pills. At approximately 1:43 p.m., CS-1 and UCE arrived in a parking lot of in Springfield, Virginia. BANIHASHEMI was already parked in the lot and waiting in a black Chevrolet

---

[4] On July 24, 2017 an official request was made by the FBI to the Virginia Employment Commission (VEC) seeking official wage and income data for BANIHASHEMI, using his Social Security number and birth date, for the time period between January 2014 and July 2017. The official response from VEC returned no record of income for BANIHASHEMI.

Avalanche pick-up truck. Upon the arrival of CS-1's vehicle adjacent to BANIHASHEMI's truck in the lot, BANIHASHEMI became nervous and entered CS-1's vehicle where UCE was waiting. BANIHASHEMI scanned the parking lot for law enforcement vehicles and felt he identified several watching them so he immediately began giving directions to CS-1 to leave the area to find a safer place to conduct the transaction away from law enforcement. BANIHASHEMI stated that he was obtaining the pills to sell to UCE from another third party (hereinafter UNSUB) who was an employee of the Pentagon and had a respectable job. BANIHASHEMI was concerned that UNSUB would not bring BANIHASHEMI the pills to complete the transaction if police were in the area. The meeting was recorded surreptitiously by CS-1 and UCE at the direction of the FBI. An excerpt of the conversation follows: [5]

| CS-1: | What do you wanna do? |
| UCE: | We could... I was hoping to get out of town tonight bro. |
| BANIHASHEMI: | Yeah? |
| UCE: | I was hoping to go home tonight. |
| BANIHASHEMI: | Yeah? |
| UCE: | What time do you think he's [UNSUB][6] going to want to do it? |
| BANIHASHEMI: | When it's dark... So that... and definitely not definitely not in V.A. |
| UCE: | Wanna go to D.C. or something... I don't know. |

---

[5] The use of ellipses in this conversation indicates a pause and does not indicate statements that have been deleted.

[6] Your affiant has reviewed the entire recording of this encounter. Based on that review, your affiant understands UCE to be referring to UNSUB.

| | |
|---|---|
| CS-1: | Yeah D.C. |
| BANIHASHEMI: | You know what? He might be in D.C. right now though. He might go to D.C. right now... I can ask him to go to D.C. right now... |
| UCE: | That's cool. I mean... I mean I don't wanna stress him out I don't wanna get... I mean he thinks... that those cars are for him. |
| BANIHASHEMI: | What do you mean? |
| UCE: | Well I mean... If somebody's following people and shit like that. Or we can do it another time or what. If I wasn't expecting this kind of... |
| CS-1: | Yeah. |
| UCE: | Yeah I wasn't expecting this kind of stress. |
| BANIHASHEMI: | Naw it didn't seem like... that's my cousin's truck. It's flashy yo [unintelligible] you can't drive that truck around like that. |
| UCE: | It's a nice truck you... |
| BANIHASHEMI: | Yeah . |
| UCE: | It's a nice truck. |
| BANIHASHEMI: | I gotta get something more incognito man you know maybe uh... |
| UCE: | We can do... is D.C. far from here? I don't even know where it is... Where the fuck are we? |

21

| | |
|---|---|
| CS-1: | Nah it's about twenty minutes. |
| BANIHASHEMI: | twenty minutes? It's not far. |
| CS-1: | Twenty minutes? |
| UCE: | Alright twenty minutes… Alright I'm cool with that. |
| BANIHASHEMI: | You wanna go to D.C.? |
| CS-1: | Whatever MGM? Wanna go over there? By the park? Where ever? |
| BANIHASHEMI: | What what… I gotta ask him… |
| CS-1: | What's your goal to the park? MGM you in D.C. you know that right? Because you see the sign on the bridge entering Virginia on the outside… What is that park over there that we gonna go to? |
| BANIHASHEMI: | I I don't know [unintelligible] … It's what he's gonna say. |
| UCE: | Does he know a good… |
| BANIHASHEMI: | [unintelligible] I yeah I'm thinking of the most safest place for him too. |
| UCE: | Yeah I I'm kind of interested in that myself… so uh what's the safest place we can do this? |
| BANIHASHEMI: | I don't know I don't [unintelligible] D.C. by the [unintelligible]. |
| CS-1: | I would say go to MGM. |
| BANIHASHEMI: | It's got a hundred million cameras. |
| CS-1: | In the car? |

22

| BANIHASHEMI: | Yeah |
| CS-1: | Come on bro... Yeah. In the car... really? Alright whatever you say. |

BANIHASHEMI continued to direct CS-1 and UCE to drive to various locations to try and detect if they were being followed by law enforcement. BANIHASHEMI directed CS-1 to drive him to another location outside a daycare center in Burke, Virginia. At this location, BANIHASHEMI acquired car keys from his girlfriend, who worked at the daycare center. CS-1 and BANIHASHEMI entered a black Honda CRV that was parked in the lot. CS-1 provided BANIHASHEMI with $1,750 cash in government funds. BANIHASHEMI and CS-1 then exited the area with CS-1 driving the black Honda CRV. UCE followed behind in CS-1's vehicle. At approximately 2:54 p.m., CS-1 and BANIHASHEMI returned to the parking lot in Springfield, Virginia. BANIHASHEMI exited the black Honda CRV, and approached the black Chevrolet Avalanche pickup truck he had previously occupied. He entered the truck, retrieved a small cellophane package containing pills, walked back over to the black Honda CRV and handed the package to CS-1. BANIHASHEMI returned to the pick-up truck and exited the area with CS-1 following behind. BANIHASHEMI, CS-1, and UCE all reconvened in the vicinity of BANIHASHEMI's residence in Burke, Virginia. UCE and CS-1 then departed the area in CS-1's vehicle. During the controlled purchase CS-1 obtained 50 small round blue pills identified as oxycodone 30 mg pills from BANIHASHEMI. These pills were sealed by your affiant and submitted as evidence at the FBI office in Manassas, Virginia.

39. In June 2017, Fairfax County law enforcement executed a search warrant at BANIHASHIME's residence in Burke, Virginia. In conjunction with the warrant, BANIHASHEMI's brother was arrested and charged with distribution of a controlled substance.

BANIHASHEMI told CS-1 that he was very concerned that law enforcement was now watching him as a result of his brother's arrest for distributing cocaine. In July 2017, BANIHASHEMI moved to Gainesville, Virginia, in an apparent effort to get away from Fairfax County law enforcement.

40.     On August 2, 2017, HUSSEINKHEL contacted CS-1 to see if UCE was interested in purchasing a .38 pistol for $750. HUSSEINKHEL sent CS-1 a photograph of the pistol via a text message attachment from his phone. CS-1 forwarded the photograph to your affiant.

41.     On November 1, 2017, CS-1 was directed by the FBI to meet with BANIHASHEMI at his new residence to discuss the future acquisition of oxycodone pills by CS-1 on behalf of UCE. The meeting was recorded surreptitiously by CS-1 at the direction of the FBI. During the meeting, BANIHASHEMI told CS-1 that he had a source in New York that would provide CS-1 and UCE 1,000 oxycodone 30 mg pills at one time but they would have to go to New York to purchase the pills. BANIHASHEMI further described to CS-1 his new business venture involving the trafficking of cannabis oil from California into Virginia to sell illegally for profit. BANIHASHEMI told CS-1 that the oils came from legitimate dispensaries in California and are administered with a vape pen. BANIHASHEMI stated, "you can get high off them anywhere...ain't got no smell." BANIHASHEMI told CS-1 that he made really good money selling the oils in Virginia and could not keep an inventory because they sold so fast. BANIHASHEMI could sell CS-1 100 vials of cannabis oil for approximately $3,000.

42.     On January 5, 2018, the FBI conducted a controlled purchase of 50 vials of cannabis oil by CS-1 from BANIHASHEMI inside BANIHASHEMI's residence. At approximately 10:49 a.m., under FBI surveillance, and after being provided with two recorders and a live transmitter, CS-1 arrived in the parking lot in front of BANIHASHEMI's residence and approached the door.

BANIHASHEMI and BANIHASHEMI's girlfriend's minor child greeted CS-1, and they entered the residence together as FBI Agents monitored the live transmitter. Approximately eight minutes later, CS-1 was observed exiting the walkway in front of BANIHSHEMI's residence carrying a white shopping bag. CS-1 entered his/her vehicle and drove under FBI surveillance to a pre-determined rally point. At this location CS-1 provided your affiant with the white shopping bag that contained 50 small tubes labeled "space ape ultra-refined activated THC 79.1%." BANIHASHEMI provided CS-1 these in exchange for $2,250 in government funds. BANIHASHEMI claimed to CS-1 that he obtained the vials from a source in Woodbridge, Virginia the previous night. The vials were sealed by your affiant and submitted as evidence at the FBI office in Manassas, Virginia.

43.     On March 15, 2018, the FBI conducted a controlled purchase of 100 oxycodone 20 mg pills by CS-1 from BANIHASHEMI inside BANIHASHEMI's residence. BANIHASHEMI facilitated this transaction directly with CS-1. At approximately 10:20 a.m., under FBI surveillance, and after being provided with $2,600 cash, two recorders and a live transmitter, CS-1 arrived in the parking lot adjacent to the black Chevrolet Avalanche pick-up truck parked in the driveway of BANIHASHEMI's residence. CS-1 walked around to the side walk in front and approached the door to the residence. BANIHASHEMI greeted CS-1, and they entered the residence together as FBI Agents monitored the live transmitter. As the counting of the money could be heard on the transmitter, BANIHASHEMI told CS-1 that he saw a female photographing CS-1 as CS-1 approached the door and asked CS-1 if CS-1 was aware of that fact. Approximately two minutes later, CS-1 was observed exiting the walkway in front of BANIHSHEMI's residence and entering his/her vehicle. CS-1 then drove under FBI surveillance to a pre-determined rally point. At this location CS-1 provided your affiant with 100 small round

gray pills stamped "K/57" identified as oxycodone 20 mg pills. The pills were sealed by your affiant and submitted as evidence at the FBI office in Manassas, Virginia.

44.     On March 15, 2018, after providing your affiant with the oxycodone pills from the controlled purchase, CS-1 returned to BANIHASHEMI's residence under FBI surveillance to pick up BANIHASHEMI to drive to a meeting with HUSSEINKHEL. HUSSEINKHEL was scheduled to serve approximately three weeks on a DWI charge in Fairfax, Virginia. BANIHASHEMI intended on providing HUSSEINKHEL with some marijuana to smoke before HUSSEINKHEL turned himself in later that day. The conversation during the drive was recorded surreptitiously by CS-1 at the direction of the FBI.

### iPhone Fraud Conspiracy

45.     HUSSEINKHEL, UCC-7, and Unindicted Co-Conspirator 8 (hereinafter UCC-8) who all work at the AT&T Store located at 5890 Kingstowne Plaza, Alexandria, Virginia, were all involved in a conspiracy to defraud AT&T of iPhones by setting up fraudulent accounts with stolen identities of unwitting persons. The iPhones were sold on the black market for profit. Many of the illegally acquired/stolen iPhones recovered in the conspiracy were sold covertly to Unindicted Co-Conspirator 9 (hereinafter UCC-9) in a parking lot in Woodbridge, Virginia.   UCC-9 sold the phones for $1,500 to $2,000 to customers in the Middle East.

46.     On March 28, 2017, CS-1 witnessed HUSSEINKHEL sell 17 iPhones in Maryland to PROCTOR. These phones were all obtained under fraudulent circumstances with the use of a false AT&T business account and a stolen identity that was used to open the account. The phones were all registered and set up as "live" (fully functional) with assistance from UCC-7.

47.     On April 27, 2017, CS-1 and UCE met with HUSSEINKHEL at the AT&T Store at 5890 Kingstowne Plaza for the purpose of purchasing iPhones using what HUSSEINKHEL

believed was a stolen credit card. At approximately 1:20 p.m., after being equipped with recorders and a live transmitter, CS-1 and UCE entered the AT&T store under FBI surveillance. An illegal iPhone transaction had previously been arranged by UCC-7, but because UCC-7 was not present at the store, HUSSEINKHEL arranged a new transaction. UCE provided HUSSEINKHEL with an undercover credit card ending in xxxx8989. UCE presented the card to HUSSEINKHEL as a card that was sourced from a stolen identity. HUSSEINKHEL sold UCE three red Apple iPhone 7 Plus phones and a Beats Solo 2 headphone for a total of $473.54, which was charged to the undercover credit card. At approximately 2:51 p.m., CS-1 and UCE departed the AT&T store with the items. These items were maintained by UCE to be sold in a later transaction to UCC-9 in Woodbridge, Virginia.

48. On April 27, 2017, at approximately 6:09 p.m., CS-1 and UCE arrived at the parking lot of the Wegman's Grocery Store located at 14801 Dining Way, Woodbridge, Virginia, under FBI surveillance. After parking next to a white Toyota sedan, a male stepped out of the Toyota sedan and greeted CS-1 and UCE as they stepped out of their vehicle. FBI Agents monitored the conversation through a covert transmitter as the male identified himself to UCE as the individual identified herein as UCC-9. During the transaction, which was also recorded surreptitiously, UCC-9 stated that he currently had 80 iPhones in the trunk of his vehicle. UCE was paid $1,500 in mostly $20 bills from UCC-9 for the purchase of three (3) iPhone 7 Plus phones. Both UCC-9 and UCE could be heard counting the cash as the transaction occurred inside UCC-9's vehicle. An excerpt of the conversation follows:

CS-1:                        Good thing that the other brother did it. Omed. He did it.

UCC-9:                      Oh. Okay, that's good.

27

| | |
|---|---|
| CS-1: | You know but the thing is, now you gotta cut Omed a piece of the action too. |
| UCC-9: | Yeah. Yeah. |
| CS-1: | You know. The thing is that we, we, gotta little thing goin on now. He [UCE][7] got a connect that can make credit cards. |
| UCE: | Yeah. |
| CS-1: | So now we can open up accounts and use the credit cards. |
| UCC-9: | Whatever you have. Whatever you can get in your hand, I will take all of them. Don't even think about going anywhere. Just bring them here. Save cash money and right away. |
| UCE: | Yeah [unintelligible]. |
| CS-1: | With him there's no issue when it comes to money. He always comes prepared. |
| UCC-9: | Yeah always. |
| CS-1: | Never once has there ever been an issue. |
| UCC-9: | Other people, they can buy like ten from you and they disappear for two months to sell them. You can, you can bring me a hundred today. It's gonna go and tomorrow you're going to bring another hundred and they're gonna go right away. |

[7] CS-1 was directed to introduce UCE to UCC-9 as an individual who can make false credit cards. Accordingly, your affiant understands CS-1's statement to be a reference to UCE.

28

At approximately 6:15 p.m., all parties returned to their respective vehicles and departed the parking lot.

49. At approximately 7:05 p.m., CS-1 and UCE arrived back at the AT&T store under FBI surveillance to pay HUSSEINKHEL $750 for his share of the transaction, as had been previously arranged. The meeting was again monitored via live transmitter and recorded surreptitiously by the FBI. During the conversation HUSSEINKHEL told UCE that UCE could "double and triple what he did today." HUSSEINKHEL discussed using more fraudulent or stolen credit cards provided to him by UCE to "grow the business." HUSSEINKHEL stated that the money they could make together with the credit card scheme is "better than drug money." HUSSEINKHEL began speaking about robbing and kidnapping an individual identified herein as Unindicted Co-Conspirator 5 (UCC-5), whom he believed was "pimping out" HUSSEINKHEL's ex-wife to set up UCC-5's drug associates who owed UCC-5 money.

50. Later on April 27, 2017 at approximately 9:00 p.m., CS-1 witnessed an incident in which HUSSEINKHEL "flipped out," vandalized the AT&T store at Kingstowne Plaza, Alexandria, Virginia, where HUSSEINKHEL was employed, and ultimately stole 16 iPhones from the AT&T. Later in the evening, after HUSSEINKHEL calmed down, CS-1 witnessed BANIHASHEMI pull a large wad of cash from a FedEx envelope and purchase the 16 stolen iPhones from HUSSEINKHEL for $7500 cash. CS-1 witnessed BANIHASHEMI sell these phones to UCC-9.

51. On February 10 and 11, 2018, CS-1 spoke to HUSSEINKEL on the phone. HUSSEINKHEL asked CS-1 if CS-1 had any connections that "we could do phones with." HUSSEINKHEL told CS-1 that he was looking to make some money selling illegally obtained

smart phones like he did in the Spring of 2017. HUSSEINKHEL specifically inquired about UCE's interest in participating again in criminal acts.

## CONCLUSION

52.     Based on the information provided in this affidavit, probable cause exists to believe that from in or about July 2016 through in or about March 2018, within the Eastern District of Virginia, OMED HUSSEINKHEL also known as "Gambit," WASSIM BANIHASHEMI also known as "Mo," and TIMOTHY DARREN PROCTOR, did knowingly, intentionally, and unlawfully combine, conspire, confederate, and agree with others, known and unknown, to distribute a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

53.     Wherefore, I respectfully request that this Court issue a criminal complaint charging OMED HUSSEINKHEL also known as "Gambit," WASSIM BANIHASHEMI also known as "Mo," and TIMOTHY DARREN PROCTOR, with violations of Title 21, United States Code, Sections 841(a)(1) and 846, and warrants authorizing their arrests.

Andrew B. Lenhart
Special Agent, FBI

Sworn and subscribed to before me this 23
day of April, 2018, at Alexandria, Virginia /s/
Theresa Carroll Buchanan
United States Magistrate Judge

The Honorable Theresa Carroll Buchanan
United States Magistrate Judge

30